# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| NATIONAL ROOFERS UNION AND EMPLOYERS JOINT HEALTH AND WELFARE FUND, ET AL. | CIVIL ACTION NO. 13-597 |
| VERSUS | JUDGE JOHN W. deGRAVELLES |
| ASCENSION SHEET METAL, LLC F/K/A ASCENSION ROOFING & SHEET METAL, INC., ET AL | MAG. JUDGE STEPHEN C. RIEDLINGER |

## RULING AND ORDER

Before the Court is Plaintiffs' Motion for Summary Judgment (Doc. 33). Defendants oppose the motion. (Doc. 38). The Court has jurisdiction pursuant to 28 U.S.C. § 1331. Oral argument is not necessary.

After carefully considering the law, facts, and arguments of the parties, Plaintiffs' Motion for Summary Judgment is granted in part and denied in part. As a matter of law: (1) Defendants owe contributions for both union and nonunion employees who performed work covered under the collective bargaining agreement; (2) Defendants owe contributions for union and nonunion employees that accrue from January 2014 until the CBA is terminated; (3) As a matter of law, Defendants owe accruing interest at 12 percent per annum and liquidated damages of 10 percent on all delinquent contributions until paid. In all other respects Plaintiffs' motion is denied.

However, as set forth below, this ruling is contingent on the fact that the Plaintiffs' are governed by ERISA. Plaintiffs' are given 14 days to supplement their Statement of Uncontested Facts to assert that they are in fact governed by ERISA. Defendants are given 7 days to respond in order to dispute this fact, if they can do so in good faith.

# I. Relevant Factual and Procedural Background

## A. Introduction

This case arises out of Defendants' alleged failure to pay nonunion employees fringe benefit contributions pursuant to a collective bargaining agreement ("CBA"). The Plaintiffs brought suit pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132 and 1145, and § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a). The Plaintiffs, National Roofers Union and Employers Joint Health and Welfare Fund, ("Welfare Fund") and National Roofing Industry Pension Fund, ("Pension Fund") (collectively "The Funds") are seeking to recover allegedly delinquent contribution payments from Defendants. Pursuant to Local Rule 56(a) and (b), The Funds have submitted a Statement of Uncontested Facts, (Doc. 33-2), and Defendants have submitted a response. (Doc. 38-1). Many of the facts of this case are uncontested by the parties.

### 1. The Funds

The Funds assert that they are employee benefit plans governed by ERISA. The Funds contend that they were "established by the National Roofers Union and employers in an industry affecting commerce, whose employees are represented by those unions for the purpose of providing health, welfare, and pension benefits to employees performing work that is covered by collective bargaining agreements." (Doc. 33-1, p. 2). Defendants have raised no argument against The Funds assertions.[1]

---

[1] The Court notes that its Ruling and Order is premised on its belief that The Funds are, indeed, ERISA benefit plans. However, the parties did not agree in their statements of uncontested facts that The Funds are ERISA benefit plans. The Funds merely assert this in their Memorandum in Support and provide no evidence conclusively establishing this fact. Nevertheless, Defendants do not argue this issue. Accordingly, the Funds are given 14 days to supplement their Statement of Uncontested Facts to assert that they are in fact governed by ERISA. Defendants are given 7 days to dispute this fact, if they can do so in good faith.

## 2. Ascension Sheet Metal LLC and JRE, LLC, d/b/a Ascension Roofing & Sheet Metal

Since 2008, Rebecca Evans-Mouk ("Mouk") and her father, John Evans, ("Evans") co-own Ascension Roofing & Sheet Metal, Inc. ("Ascension"). (Statement of Uncontested Facts, Doc. 33-2, p. 1); (Defendants' Response to Plaintiffs' Statement of Uncontested Facts, Doc. 38-1, p. 1). In 2012, Ascension's services expanded because Mouk and Evans became general contractors. *Id.* Mouk and Evens Incorporated "JRE, LLC," which operates "doing business as" Ascension Roofing and Sheet Metal. (Doc. 33-2, p. 1); (Doc. 38-1, p. 1). Payroll records from Ascension show that the company operates under the name JRE, LLC ("JRE"). (Doc. 33-2, p. 4); (Doc. 38-1, p. 6). Defendants admit that JRE and Ascension (collectively "Defendants") "are one and the same entity sharing common ownership and enterprise[.]" (Doc. 37, p. 7 ¶ 26). Furthermore, Defendants have admitted that JRE is the owner of Ascension and that JRE is its alter ego for purposes of this lawsuit.[2] (Doc. 38-2, p. 5).

The parties agree that Defendants offer services in roofing and waterproofing; however, Defendants further assert that these are only two of the areas of service the company offers. (Doc. 33-2, p. 1); (Doc. 38-1, p. 1). Defendants claim that "the company is a union shop for sheet metal fabrication and general contracting, as for the construction of buildings and other structures and engages subcontractors to complete projects in all trades necessary to complete its contractual agreements." (Doc. 38-1, p. 1). Defendants further assert that "[r]oofing is becoming less of the work of the company with the passage of time." (Doc. 38-1, p. 1-2). Nevertheless, Defendants admit that they have no plans of phasing out their roofing work. (Doc. 33-2, p. 2); (Doc. 38-1, p. 2).

---

[2] As Defendants have admitted that JRE is Ascension's alter ego, the Court has interpreted Defendants' admissions regarding Ascension to apply to both Ascension and JRE.

As President, Mouk serves mainly in a management role. *Id.* She is responsible for hiring and firing employees, soliciting new customers, signing contracts, and estimating time and costs for a project. *Id.* Mouk is authorized to bind the company. *Id.* Defendants concur with this explanation of Mouk's role, but further assert that "she is responsible for maintaining of the company's financial records and is the owner/member most responsible for the roofing part of the business operation." (Doc. 38-1, p. 2).

### 3. The Collective Bargaining Agreement

Since 2008, Defendants have operated under a CBA between the Baton Rouge Roofing and Sheet Metal Contractors Association and the United Union of Roofers, Waterproofers and Allied Workers Local 317[3] ("Union"). (Doc. 33-2, p. 2); (Doc. 38-1, p. 2). On December 2, 2010, Evans entered Defendants into a CBA[4] between the Union and the Contractors Association.[5] The CBA was effective until November 30, 2012. (First Amending Complaint, Doc. 31, p. 4 ¶ 9); (Defendants Answer to First Amending Complaint, Doc. 37, p. 3 ¶ 9). On January 23, 2013, Mouk renewed the CBA. (Doc. 33-2, p. 2); (Doc. 38-1, p. 2). Mouk and Evans understand that their company is operating under the CBA. *Id.* Defendants admit in their Motion in Opposition that the Agreement was automatically renewed through 2015.[6] (Doc. 38-2, p. 8).

Initially, Defendants relied on the Union referral system for its roofer employees and relied on the Union's classification for its roofer employees. (Doc. 33-2, p. 2); (Doc. 38-1, p. 2).

[3] The Union is not a party to this case.
[4] There is some discrepancy between The Funds amended complaint and motion for summary judgment as to whether the agreement is a "pre-hire agreement" or a CBA. However, both parties refer to the agreement as a CBA in their motions in support and opposition. Furthermore, the differences between these two types of agreement relate to how they are formed and the effects of termination. *See Strand Theatre of Shreveport Corp. v. NLRB*, 493 F.3d 515, 518–19 (5th Cir.2007). As these differences are not as issue, the Court refers to the agreement as a CBA.
[5] Defendants admitted in the uncontested facts that they have operated under a CBA since 2008, (Doc. 38-1, p. 2). However, they have also admitted in their answer to the first amended complaint that they "entered into" the CBA on December 2, 2010. (Doc. 37, p. 3 ¶ 9). While there is an apparent discrepancy between when the CBA became effective, The Funds have admitted that "[Defendants] paid contributions to [T]he Funds until 2011." (Doc. 39, p. 2). As The Funds have admitted contributions were paid prior to 2011, this discrepancy is not at issue.
[6] Because Defendants have admitted that the CBA was automatically renewed, the Court finds it unnecessary to address The Funds' argument and evidence (Doc. 33-10) regarding Defendants' attempted termination of the CBA.

When Defendants used the Union referral system, all roofers employed were Union members. *Id.* Sometime in 2011 or 2012, Defendants stopped using the Union referral system and hired general laborers and/or subcontractors for roofing work. (Doc. 33-2, p. 3); (Doc. 38-1, p. 3). Defendants concur, but further state "that the union could no longer provide roofers after repeated requests." *Id.*

The Funds contend that Defendants continue to operate as a contractor engaged in roofing and waterproofing work; and continue to assign general laborers to perform its roofing work. *Id.* Defendants concur, but assert that the "Union cannot provide qualified workers for the roofing jobs the company does[.]" (Doc. 38-1, p. 3).

The parties agree that "[n]o contributions are paid for the general laborers performing roofing work because Mouk and Evans only paid contributions for union members." (Doc. 33-2, p. 3); (Doc. 38-1, p. 3). Blank remittance reports issued to the Funds indicated that Defendants had no employees engaged in roofing. (Doc. 33-2, p. 3); (Doc. 38-1, p. 3). Defendants concur, but further claim that "the reports were only as to union workers not general laborers that may have in engaged[sic] in some roofing work. The reports only applied to union workers." (Doc. 38-1, p. 3).

The Funds contend that "[Defendants] rely on general laborers to lay up a roof by cutting insulation, installing crickets and saddles, mopping, setting felt and heat weld [sic]." (Doc. 33-2, p. 3); (Doc. 38-1, p. 3). Defendants concur by stating "[Evans] made that statement." (Doc. 38-1, p. 3). Defendants then assert that "[Mouk] explains that very little of this type of work is done by the company. The company does mostly coatings – not tear offs, crickets or mopping. Subcontractors do the cutting of insulation, installing crickets and saddles, mopping, setting felt and heat welding." (Doc. 38-1, pp. 3-4) (citing Doc. 38-3).

As a default practice, Mouk classifies a nonunion employee engaged in roofing and labor as a "general laborer." (Doc. 33-2, p. 3); (Doc. 38-1, p. 4). Defendants concur with this statement, but contend that "not all persons classified[] as general laborers are roofers as assumed incorrectly by the auditors of Plaintiffs. Most of the 'roofing work' is done by subcontractors since no roofers have been provided by the union." (Doc. 38-1, p. 3). Mouk believes roofer subcontractors are not covered under the CBA because they are not direct hires or "employees" under the CBA. (Doc. 33-2, p. 3); (Doc. 38-1, p. 4).

The parties agree that a majority of roofing work done by Defendants is described under Article III, Work Jurisdiction Section 3 of the CBA. (Doc. 33-2, p. 3); (Doc. 38-1, p. 4). Defendants also do roofing work described in Sections 2 and 4 of the CBA. (Doc. 33-2, p. 3); (Doc. 38-1, p. 4).[7]

### 4. The Payroll Audit

The Funds assert that Defendants were "selected for a payroll audit to evaluate whether contributions are owed." (Doc. 33-2, p. 4). Defendants disagree and claim that "[the payroll audit] was done to harass the owners of JRE, LLC, particularly, [Mouk], and was instigated by James Scott, the local union representative for reasons to be shown at trial." (Doc. 38-1, p. 4). The Funds claim that Defendants "provided payroll records only after the Court granted the motion to compel." (Doc. 33-2, p. 4) (citing Ruling on Motion to Compel Discovery, Doc. 19). Defendants disagree and contend that "[p]ayroll records were provided but not to the extent demanded by Plaintiffs prior to the motion to compel filed by Plaintiffs." (Doc. 38-1, pp. 4-5).

For the payroll audit, Defendants provided complete payroll records as they pertain to all employees. (Doc 33-2, p. 4); (Doc. 38-1, p. 5). The Funds claim that Defendants do "not itemize work hours according to the job performed." (Doc 33-2, p. 4). The Funds auditor included all

---

[7] These provisions are provided below.

"general laborers" in its calculation to determine the amount of delinquent contributions owed. The Funds assert in their reply memorandum that the auditor included all "general laborers" in the audit report because of "Mouk's explanation that when a formerly classified roofer from the union returned to [work for Defendant], '[h]e came back to the company as a general laborer.' " (Doc. 39, p. 8).

Defendants contend that "[n]onunion employees are classified as general labor, however not all general laborers are engaged in roofing for the company." (Doc. 38-1, p. 5). However, both parties agree that a general laborer may earn over $20.00 per hour, and wages do not distinguish a roofer from a general laborer. (Doc 33-2, p. 4); (Doc. 38-1, p. 5).

The Funds assert that the "auditor, Legacy Professional LLP, ("Legacy") conducted a payroll audit based on payroll records obtained in discovery from January 1, 2011 to December 31, 2013." (Doc 33-2, p. 4). Defendants "do not completely concur" with this statement, and contend that "other information previously supplied to the auditors may have been used, which is unknown to Defendants." (Doc. 38-1, p. 5). The Funds claim that "[d]elinquent contributions were found to be owing on reported and unreported employees." (Doc 33-2, p. 4). Defendants disagree and claim "no amounts are due [The Funds] by [D]efendants as all amounts due have been paid before the audit was undertaken." (Doc. 38-1, p. 5). Defendants further contend that:

> The auditors of the [The Funds] made incorrect assumptions that all employees listed as general laborers were roofers on the employee rolls of JRE, LLC. The auditors incorrectly calculated amounts for workers that have no connexity to roofing in the company as far as work assignments go and also incorrectly listed general laborers or employees, who worked on roofing projects that did not have roofing union members on the job and therefore no payments are due as the company was not operating as a union shop with the employees used on those jobs because there were no union workers present or qualified to do the jobs in the locations on which they were done, namely chemical plants and United States Government facilities.

(Doc. 38-1, pp. 5-6).

### 5. Individual Workers

The parties agree that Mouk classifies employees. (Doc 33-2, p. 5); (Doc. 38-1, p. 6). Payroll records entitled, "JRE Payroll Allocation" and "JRE, LLC Employee Classification" show classifications provided by Mouk. *Id.*

The parties agree that Eugene Jackson and Roosevelt Givens should be classified as roofers. (Doc 33-2, p. 4); (Doc. 38-1, p. 6). The Union once classified Neil Andrews as a roofer apprentice. (Doc 33-2, p. 4); (Doc. 38-1, p. 6). Additionally, both parties agree that the JRE, LLC Payroll Allocation records designate the following employees as "roofers" in the Roofing Division: Neil Andrews, Eric Aguillar, Andy Grijalva, Sonny Grijalva, Erasma Guitierrez, Ernesto Guitierrez, Guadalupe Izaguirre, Jesus Izaguirre, Jose Orozco, Byron Ottes, Thompson Gregory and Candace Washington. (Doc 33-2, p. 5); (Doc. 38-1, p. 6). However, Defendants contend that "they do not always act as roofers[.] [S]ome of them are independent contractors." (Doc. 38-1, p. 6).

Both parties agree that the JRE, LLC Employee Classification, designate the following employees as "roofers:" Neil Andrews, Byron Ottes, and Levy Patton. (Doc 33-2, p. 5); (Doc. 38-1, p. 7). Guadalupe Izaguirre and Jesus Izaguirre are also listed as roofing subcontractors; however, they were on Ascension's payroll in 2012. (Doc 33-2, p. 5); (Doc. 38-1, p. 7). Additionally, the following employees are classified as "pre-apprentice/general laborers:" Hunter Beavers, Steven Hale, Philip Hicks, John Hirtler, Stephen Jacks, and Shane Rousel.[8] (Doc 33-2, p. 5); (Doc. 38-1, p. 7).

---

[8] While the parties agree that these workers are classified as "pre-apprentice/general laborers," these employees appear to be sheet metal workers, rather than roofers. This was clarified in The Funds memorandum in support. (Doc. 33-1, pp. 19-21).

Defendants admit that they do "not remit contributions for employees classified as general laborer or roofing subcontractor and pre-apprentice/general laborers." (Doc 33-2, p. 5); (Doc. 38-1, p. 7).

### 6. Remedy Sought by The Funds

The Funds seek the following remedies:

1. $175,157.13 as a partial payment pending a final payroll audit and compliance under the CBA. This amount includes:

   a. $134,098.88, representing the amount owed as delinquent contributions for the period from January 2011 through December 2013,[9] including 12 percent per annum interest and 10 percent liquidated damages. This amount includes:

      i. $73,597.17 in unpaid contributions, $14,779.57 in interest, and $7,359.72 in liquidated damages to the National Roofers Union And Employers Joint Health and Welfare Fund; and

      ii. $29,565.85 in unpaid contributions, $5,839.99 in interest, and $2,956.58 in liquidated damages to the National Roofing Industry Pension Fund.

   b. $4,950.75, representing the payroll audits fees.

   c. $36,107.50, representing to date attorneys' fees.

2. Accruing and continuing contributions from January 2014 to present.[10]

---

[9] The Court notes that in The Funds' Motion for Summary Judgment they ask for delinquent contributions from January 2011 to January 2013, (Doc 33, p. 2), while in their Memorandum in Support, they ask for delinquent contributions from January 2011 to December 2013. (Doc. 33-1, p. 29). As the amount of damages they request is the same, and the audit report calculated delinquent contributions from January 2011 to December 2013, (Doc. 33-7), it is reasonable for the Court to infer that this was merely an oversight on the part of The Funds and is not fatal to their motion.

[10] Similar to note 9, *supra*, The Funds asked for accruing and continuing contributions from January 2013 to present in their Motion for Summary Judgment, (Doc 33, p. 2), while they ask for contributions from January 2014 to present in their Memorandum in Support. (Doc. 33-1, p. 29). The Court, again, finds it reasonable to infer that this was merely an oversight on the part of The Funds and is not fatal to their motion.

3. Accruing interest at a rate of 12% per annum and liquidated damages of 10% on all contributions.

(Doc. 33, p. 2); (Doc. 33-1, p. 20).

## II.     Present Motion

The Funds now move for summary judgment pursuant to Federal Rule of Civil Procedure 56.

### A.  The Funds' Argument

The Funds argue that ERISA, 29 U.S.C. §§ 1132 and 1145, and the LMRA, 29 U.S.C. § 185(a), govern this action to collect unpaid fringe benefits under the terms of the CBA. (Doc. 33-1, p. 8). Additionally, The Funds argue that, as a signatory employer to the CBA, Defendants agreed to make contributions to the Funds regardless of union affiliation. (Doc. 33-1, p. 10). The Funds claim that the CBA covers any person performing work as described in the CBA. (Doc. 33-1, p. 13). The Funds assert that the CBA details the roofing and waterproofing work processes, and requires benefit contributions for all employees engaged in covered employment. (Doc. 33-1, p. 13).

Furthermore, the Funds argue that contributions are owed for "overlooked roofers" and for employees engaged in roofing work that are classified as "general laborers" because they are engaging in work falling within the craft definition under the CBA. (Doc. 33-1, p. 15-19). The Funds argue that Defendants "also operate under a second CBA[11] with the Sheet Metal Workers" and that contributions are owed for sheet metal employees classified as "general laborers/pre apprentice." (Doc. 33-1, p. 15-19). The Funds argue that their payroll audit is entitled to a presumption of correctness. (Doc 33-1, p. 21). Finally, The Funds argue that Mouk's testimony

---

[11] The Funds claim that there is a second CBA but have not provided this second CBA to the Court.

establishes that "general laborers" perform work described under the CBA. (Doc. 33-1, pp. 21-23).

### B. Defendants' Argument

Defendants argue in their opposition that they are not subject to remitting contributions for non-union roofers or subcontractors who do roofing work. Defendants assert that Louisiana is a right to work state and that this law applies to them and their non-union employees. (Doc 38-2, p. 1) (citing La. R.S. 23:981). Defendants argue that the Union failed to provide the necessary qualified workers for their work, such as drug free employees. (Doc. 38-2, p. 2). Defendants assert that "[t]here is nothing in the [CBA] that prohibits [Defendants] from conducting [their] business as a non-union shop especially when the union cannot provide qualified employees[.]" *Id.*

Defendants contend that The Funds auditor incorrectly assumes that all workers listed as "general laborer" are non-union roofers. *Id.* Defendants claim that general laborers do not perform roofing work exclusively, and that some of them do no roofing at all. *Id.* Defendants also argue that The Funds do not have written authorization from employees to withhold any sums. (Doc. 38-2, p. 7). Defendants assert that the union does not represent the non-union employees, and that The Funds cannot prove what work the non-union employees engage in. (Doc. 38-2, p. 9).

### C. The Funds' Reply

The Funds counter that employees are not required to join a union or submit authorization to withhold funds because contributions are owed based on covered employment rather than union status. (Doc. 39, p. 3). The Funds also assert that Defendants confuse the written authorization requirement for union dues deductions with contributions. (Doc. 39, p. 3 n. 5). The

Funds contend that contributions are deductible by the employer in calculating federal and state income taxes or payroll taxes and are not considered wages. *Id.* Additionally, The Funds argue that Defendants lack competent evidence to rebut their audit report. (Doc. 39, p. 7). Finally, The Funds argue that Defendants have no valid defense to their delinquent contributions. *Id.* at 8.

## III.  Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "[I]f the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir.1986). A party must support its summary judgment position by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. Rule Civ. P. 56(c)(1).

If the mover bears his burden of showing that there is no genuine issue of fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–587, 106 S.Ct. 1348 (1986) (internal citations omitted). The non-mover's burden is not satisfied by "conclusory allegations, by unsubstantiated assertions, or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (citations and internal quotations omitted). "Where the record taken as a whole could not lead a rational trier of fact to

find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. Further:

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable [fact-finder] drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion.

*International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir.1991).

## IV. Discussion

### A. Applicable Law

The Funds assert that federal law governs this case because they are seeking to collect delinquent contributions in accordance with ERISA and the LMRA. (Doc. 33-1, pp. 8-10). Conversely, Defendants essentially assert that Louisiana law should govern and that because Louisiana is a right to work state, they do not owe contributions for nonunion employees under the CBA. (Doc 38-2, p. 1) (citing La. R.S. 23:981). Here, the Court agrees with The Funds that federal law applies.

Section 301(a) of the LMRA provides:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C.A. § 185.

The Fifth Circuit has recently explained:

> When interpreting a collective bargaining agreement, federal law governs. *See Int'l Ass'n of Machinists & Aerospace Workers v. Masonite Corp.,* 122 F.3d 228, 231 (5th Cir.1997); *see also Textile Workers Union v. Lincoln Mills of Ala.,* 353 U.S. 448, 456–57, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). Nevertheless, "courts may draw

upon state rules of contractual interpretation to the extent that those rules are consistent with federal labor policies." *Nichols v. Alcatel USA, Inc.,* 532 F.3d 364, 377 (5th Cir.2008) (internal quotation marks omitted). "However, the construction and application of a collective bargaining agreement's terms cannot be strictly confined by ordinary principles of contract law." *United Paperworkers Int'l Union v. Champion Int'l Corp.,* 908 F.2d 1252, 1256 (5th Cir.1990). "The provisions of a labor contract may be more readily expanded by implication than those of contracts memorializing other transactions." *Id.*

*Savant v. APM Terminals*, 776 F.3d 285, 289 (5th Cir. 2014).

Furthermore, collection of unpaid contributions is governed by section 515 of ERISA, which provides that:

Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145.

The Fifth Circuit has stated that there are only three recognized defenses to delinquency actions: (1) the pension contributions are illegal, (2) the CBA is void ab initio, e.g., for fraud in the execution, and (3) the employees have voted to decertify the union as their bargaining representative. *Louisiana Bricklayers & Trowel Trades Pension Fund & Welfare Fund v. Alfred Miller Gen. Masonry Contracting Co.*, 157 F.3d 404, 408 (5th Cir. 1998).

Defendants do not raise any of these defenses. Instead, Defendants essentially argue that they are not obligated to make contributions for nonunion employees. Defendants argue that no contributions are owed for nonunion employees because they are not represented by the union and the employees have not given written authorization for contributions. These arguments will be addressed below.

## B. Third Party Beneficiaries

First, The Court finds it necessary to address The Funds' status as it relates to the CBA because the majority of Defendants' arguments concern the Union's alleged breaches of the CBA.[12]

In *Shreveport Elec. Profit Sharing Plan v. Roper Elec. Co.*, No. CIV.A. 04-1730, 2006 WL 149033 (W.D. La. Jan. 18, 2006), the Western District had a similar case brought by plaintiff benefit plans seeking delinquent contributions. The Western District explained:

> The Benefit Plans are third-party beneficiaries of the collective bargaining agreement between [the defendant] and the Union. *See Agathos v. Starlite Motel,* 977 F.2d 1500, 1505 (3rd Cir. 1992) (citation omitted). The rights of third-party beneficiaries typically are subject to any defenses that the promisor could assert in a suit by the promisee. *Id.* (*citing* J. Calamari & J. Perillo, *The Law of Contracts* § 17-10 (3d ed. 1987)). Collective bargaining agreements, however, are not typical third-party beneficiary contracts. *Id.* (*citing Lewis v. Benedict Coal Corp.,* 361 U.S. 459, 468-69, 80 S. Ct. 489, 495, 4 L.Ed.2d 442 (1960)). In *Lewis,* the Supreme Court held that a union's breach of a collective bargaining agreement could not avoid an employer's obligation to make contributions to a union welfare fund, unless the parties agreed to preserve such a defense in unequivocal words. *Id.* at 470-71, 80 S. Ct. at 495-96.

*Roper Elec. Co.*, 2006 WL 149033, at *5.

Similarly, The Funds in this case are third-party beneficiaries to the CBA between the Defendants and the Union. Thus, Defendants cannot use the Union's alleged breach of the CBA to avoid their obligation to make contributions to fringe benefit funds. *See Id.*

---

[12] Defendants allege numerous times through their Memorandum in Opposition that the Union has breached the CBA because: "the [U]nion cannot provide qualified employees to help [Defendants] conduct its business." (Doc. 38-2, p. 2). "[T]he [Union] failed to provide the necessary qualified union workers for the job duties undertaken by [Defendants] ... which require drug free employees[,] TWIC Cards and other clearances, which the [Union] cannot provide to Defendants." (Doc. 38-2, p. 2). "[T]he [Union] cannot provide the quality and quantity of employees needed to complete the work of [Defendants], that in itself is a breach of the [CBA] by the [Union]." (Doc. 38-2, p. 6). "The Union is required to register all applicants." (Doc. 38-2, p. 6), "If the [Union] would have provided the necessary workers for [Defendants] to conduct their business, [Defendants] would gladly pay the wages and benefits of union workers[.]" (Doc. 38-2, p. 8).

### C. Contributions for Nonunion Employees Performing Covered Work Under the CBA

The Court agrees with The Funds that contributions are owed for nonunion members performing work covered under the CBA. Defendants' argument that they do not have to pay contributions for nonunion employees because of Louisiana's status as a right to work state is unpersuasive.

The Funds assert that the CBA "describes in detail roofing and waterproofing work processes." (Doc. 33-1, p. 13). Additionally, though not cited to by either party, the CBA provides the geographic jurisdiction of the covered work. The CBA, in pertinent part, provides the following:

**Article II**
**Geographic Jurisdiction**

This Agreement shall cover work performed in the State of Louisiana.

**Article III**
**Work Jurisdiction**

These Articles of Agreement shall cover the following work:

**\*\*\***

**Section 2.** Composition roofers shall also include in their work jurisdiction the following work processes and types of material including but not limited to: All organic or inorganic felts and fabrics that comprise the reinforcement membrane of built-up roofing and waterproofing system…. All components of composition roofing systems used to seal the roof, including but not limited to compression seals, termination bars, lath, roof cement and reinforcements, caulking and sealants…. All kinds of coal tar pitch … All forms of insulation used as part of or in connection with roofing waterproofing or dampproofing …

**Section 3.** Composition roofers shall also include in their work jurisdiction the following work processes and types of material

including but not limited to: (1) All forms of elastometic and/or plastic (elasto-plastic) roofing systems, both sheet and liquid applied, whether single-ply or multi-ply…. (2) All base flashings, curb flashings and counterflashings … (4) All forms of composite insulations … (10) All cleaning, preparing, priming and sealing of surfaces to be roofed, dampproofed or waterproofed, whether done by roller, mop … or any other means of application….

**Section 4.** All tear-off and/or removal of any type of roofing, all spudding, sweeping, vacuuming and/or cleanup of any and all areas of any type where a roof is to be relaid, or any materials and operation of equipment such as kettles pumps, tankers or any heating devices that are used on roofing or waterproofing systems coming under the scope of jurisdiction as outline in Article III.

(Doc. 33-6, pp. 6-9). [13]

Here, the CBA clearly describes, in detail, the work that is to be covered under the CBA. Thus, any work performed by Defendants' employees that is defined under these sections constitutes covered work. The Funds argue that the CBA requires benefits for all employees engaged in covered employment, as defined above. (Doc. 33-1, pp. 13-14).[14]

---

[13] The Court notes that The Funds attached the CBA to their memorandum as Exhibit 3. (Doc. 33-6). However, Defendants, in their Memorandum in Opposition, cite to "the [CBAs] attached to [The Funds'] motion as Exhibit 1 and Exhibit 2[.]" (Doc. 38-2, p. 3). This discrepancy apparently arose because in Mouk and Evan's depositions Exhibits 1 and 2 were the original CBA and the renewed CBA respectively. (Doc. 33-4, p. 3). The CBA attached as Exhibit 3 is labeled "Exhibit 2" and "MSJ EXH. 3" (Doc. 33-6, p. 1). Even so, the provisions Defendants cite are identical to the provisions of the CBA The Funds attached as Exhibit 3. Thus, it is reasonable for the Court to infer that Defendant intended to cite to Exhibit 3. (Doc. 33-6).

[14] In support of this argument, The Funds also cite to a provision of Article XVI which concerns classifying roofers, and provides:

**Article XVI**
**Probationary Apprentices/Classified Roofers**
\*\*\*

Effective October 1, 2006 and thereafter all new employees that are not designated as a journeymen, apprentice or probationary apprentice Roofer will be referred to as a classified roofer and will be paid the wages and benefits as stipulated on Wage Addendum II. All classified roofers after [their] third year of employment will remain at eighty-five percent (85%) of journeymen pay plus benefits …

Thus, this provision provides that those employees who are new to the field of roofing have a separate classification of "classified roofer," but that they still receive pay and benefits under that classification in accordance to Wage Addendum II. However, the CBA does not have a Wage Addendum II attached to it. The CBA only contains a Wage Addendum I. Thus, it is not clear at what hourly rate a "classified roofer" will be paid, or how much benefit contributions are owed for classified roofers.

Finally, the relevant provisions that cover contributions to The Funds as it relates to covered employment provide, in pertinent part:

## Article XXIV
## Health and Welfare

Section B: … The Employer shall contribute to the National Roofers Union and Employers Joint Health and Welfare Fund the amount or amounts set forth herein on the attached Wage Addendums, for *each hour for which the Employer is obligated to pay compensation to each employee covered by this Collective Bargaining Agreement*….

## Article XXIV
## Health and Welfare
## and
## Article XXV Pension Plan[15]

Section C: The Employer agrees to be bound by and party to the aforesaid Agreement and Declaration of Trust and all rules and regulations covering the Health and Welfare Fund [and covering the Defined Benefit Plan] … excluding any action which is prohibited by statute, alters the Employer's contractual obligations regarding contributions or which will divert the assets of the Trust Fund from the purposes for which said Trust Fund was created, namely the establishment of health and welfare benefit plans [and retirement benefit plans] for employees in the roofing industry.

\*\*\*

Section G: The contributions required by this Article shall accrue with respect to all hours worked by any working foreman journeymen apprenticeship or for any person performing work within the collective bargaining agreement unit covered by this Agreement and said contributions shall accrue with respect to all hours worked by employees covered by the terms of this Agreement within or outside the geographical jurisdiction of the Union, EXCEPT when work is performed outside of the Union's geographical jurisdiction where another fringe benefit fund of a similar kind exists and the Employer is contractually obligated to, and does, contribute to that fund then, the said Employer shall not be required to pay contributions to this Fund. . .

(Doc. 33-6, pp. 18-21) (emphasis added).

---

[15] The Court notes that Section C and G in Article XXIV and XXV are identical other than naming which of The Funds contributions are made to.

The Funds argue that contributions under these sections are owed regardless of union affiliation. (Doc. 33-1, p. 10). The Funds assert that "[t]his issue has been resolved in *D.E.W., Inc. v. Loc. 93, Laborers' Intern. Union of N.A.*, 957 F.2d 196, 198 (5th Cir. 1992)." (Doc. 33-1, pp. 10-11). Defendants counter that *D.E.W., Inc.* "[is] inapplicable to [this] controversy because *D.E.W., Inc.* was an interpretation of a union contract and laws in effect in Texas in the early 1980s and early 1990's." (Doc. 38-2 p. 9). Defendants further contend that *D.E.W., Inc.* "did not take into consideration Louisiana's strong public policy statement ... against compelling its citizens from being forced to join unions and to be protected from them" *Id.*

### 1. Contributions Required Under Federal Law

The Court rejects Defendants' contentions as being inconsistent with *D.E.W., Inc.*. While the facts of *D.E.W., Inc.* are readily distinguishable from this case, the Fifth Circuit's reasoning in *D.E.W., Inc.* provides ample guidance to the Court.

In *D.E.W., Inc.*, D.E.W. entered into an adoption agreement[16] with the plaintiff funds under which D.E.W. agreed to make contributions to the plaintiff funds based on each hour the covered employees worked. *D.E.W., Inc. v. Loc. 93, Laborers' Intern. Union of N.A.*, 957 F.2d 196, 198 (5th Cir. 1992). Even so, D.E.W. only made contributions on behalf of its union members. *Id.* An audit was conducted of D.E.W.'s payroll records to determine what contributions were being made to the funds. *Id.* The audit resulted in the administrators of the plaintiff funds making a demand on D.E.W. for contributions they concluded were owed to the

---

[16] "An adoption agreement is an agreement independent of a collective bargaining agreement under which in this case the employer individually assumed and agreed to adopt the terms of multi-employer union trust funds agreements and agreed to make contributions to the funds for covered workers." *D.E.W.*, 957 F.2d at 198 n. 2. In the present case, the CBA itself contains three articles, XXIV XXV and XXVI, which require and explain contributions to The Funds. (Doc. 33-6, pp. 17-22). Thus, in this case, the CBA basically incorporates what would be contained in an adoption agreement.

plaintiff funds for D.E.W.'s nonunion employees. *Id.* D.E.W. disputed the demand, claiming that it was not required to contribute benefit payments to the funds for its non-union employees. *Id.*

The Fifth Circuit explained the interpretation of the adoption agreement as thus:

> The interpretation of this adoption agreement, as with any contract, is a question of law. The determination of whether a contract is ambiguous is also a question of law. A contract is not ambiguous merely because the parties disagree upon the correct interpretation or upon whether it is reasonably open to just one interpretation. *The mere disagreement of the parties upon the meanings of contract terms will not transform the issue of law into an issue of fact.* If the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous, and this Court will construe the contract as a matter of law. Of course, if the contract is ambiguous, summary judgment is deemed inappropriate because its interpretation becomes a question of fact.

*D.E.W.,* 957 F.2d at 199 (internal citations omitted) (emphasis added).[17]

In *D.E.W., Inc.* there was a conflict between the interpretations of two provisions of the adoption agreement. First, Section 1(a) of the adoption agreement provided that contributions were owed for "1) employees who are members of a participating Local Union of the Laborers' International Union of North America; and 2) employees who have their wage rate and working conditions established by the collective bargaining agreement negotiated by the Association and Local Union which established the Fund." *Id.*

Under section 1 of the adoption agreement, the district court found that because the parties stipulated they never entered into a CBA, contributions were not owed, and D.E.W. reasserted that argument on appeal. *Id.* at 200. However, on appeal, the Fifth Circuit rejected this

---

[17] It is true that this standard used by the Fifth Circuit governs the interpretation of contracts under Texas law. However, interpretation of contracts under Louisiana law follows similar principals. *See Angus Chem. Co. v. Glendora Plantation, Inc.,* 782 F.3d 175, 179-80 (5th Cir. 2015). Further, the issue in this case is whether nonunion employee benefit contributions must be paid under federal law. Thus, contrary to Defendants assertions, the Court is not strictly bound to state law. *See Savant* 776 F.3d at 289 ("[T]he construction and application of a collective bargaining agreement's terms cannot be strictly confined by ordinary principles of contract law.").

argument because it found that the Trial Court ignored a second provision of the contract, Section 3, which provided:

> The undersigned Employer agrees to contribute to each: the Welfare Fund, the Pension Fund and the Training Program, *the contributions required by the then current collective bargaining agreement* which is in effect from time to time between L.I.U.N.A. Local 93 and South Texas Contractors Association at the times and in the amounts set forth therein and in accordance with the Trust Agreement establishing each of the Trust Funds as they may be amended from time to time….

*Id.* (emphasis added).

The Fifth Circuit held that Section 3 adopted the CBA, and explained:

> The adoption agreement is equally as clear that in section 3 it adopted the contribution provisions of the collective bargaining agreement. The agreement itself provides for contributions in the amount set out in Article XXV. Article XXV provides without any ambiguity that *all employees in the defined laborer classifications receive the benefits, including contributions to all of the Funds*. What is critical in these provisions of the bargaining agreement which the parties adopted is that *"union" and "non-union" are not even mentioned in the provision*. There is no distinction made in benefits or contributions between union and non-union employees.

*Id.* (emphasis added).

D.E.W. argued that because it never signed the CBA it should not be bound by the terms of the CBA. The Fifth Circuit rejected this argument, and held that "D.E.W. did not need to have signed the collective bargaining agreement to be bound by its terms because it clearly adopted them in the adoption agreement." *D.E.W., Inc.*, 957 F.2d at 201. Thus, under the CBA, D.E.W. agreed that it would pay contributions for all laborers as mandated by the collective bargaining agreement. *Id.* Contributions were not limited only to those made on behalf of union members. *Id.*

The Fifth Circuit, in addressing the conflict between the two sections of the adoption agreement, found the contract unambiguous because of one strong and persuasive consideration:

"[e]xcept for the rarest of circumstances, this adoption agreement *if it limits contribution to union members only is in violation of federal law*. The illegality arises under section 8(a)(3), 29 U.S.C. § 158(a)(3), of the [LMRA]." *D.E.W., Inc.*, 957 F.2d 201-02 (emphasis added).

Section 8(a)(3) of the LMRA provides, in pertinent part, that:

> It shall be an unfair labor practice for an employer—by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization …

29 U.S.C. § 158(a)(3).

The Fifth Circuit analyzed the legality of encouraging union membership in the context of Texas state law and explained:

> If the contribution plan is limited to union members only and no virtually identical benefits are paid to non-union employees, membership in the union is encouraged. Since Texas is a right-to-work state, advantageous benefits to union members violate the Texas statute as encouraging a union shop which is forbidden by the state. On the other hand, if there is a separate benefit program for non-union employees which is more favorable to them, membership in the union is discouraged in violation of the law.

*Id.* at 202 (citation omitted).

The Fifth Circuit explained that the district court's interpretation, which held that only Section 1(a) of the agreement applied, "is a violation of Sec. 8(a)(3) of the [LMRA] and in turn of Sec. 8(a)(1) [of the LMRA] prohibiting coercive conduct." *Id.* "[I]t is 'inherently destructive' of important employee rights." *Id.* (citing *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 34, 87 S.Ct. 1792, 1798, 18 L.Ed.2d 1027 (1967)). Furthermore, the *D.E.W., Inc.* court explained that "[t]he absence of any distinction in the agreements between union and non-union members can be easily explained*: the law does not permit such a distinction*." *Id.* (citing *Byrnes v. DeBolt Transfer, Inc.*, 741 F.2d 620, 623 (3rd Cir.1984)) (emphasis added).

Next the Fifth Circuit analyzed the wording of the adoption agreement and explained:

It follows that the wording of section 1(a) may be inept but its purpose must be one of inclusion of non-union employees rather than exclusion. The coverages definition was copied from the definition of covered employees in the Health and Welfare Fund basic document itself. This document, and its definition, on its face was written originally to cover employers who had signed a collective agreement and had both union and non-union employees covered by bargaining. Inclusion of non-union employees was necessary to make the provision lawful, and it was difficult to define the employees included. The non-union employees had to be those, but only those, who were counterparts of the union employees in their work. Actually, spelling it out in more detail, the non-union employees had to be those who would be included in the same collective bargaining unit as included the union employees if there had been a bargaining unit.

Yet, if this interpretation is unacceptable, it makes no difference. The provision otherwise is illegal and we are still left with a contract that is unambiguous and requires employer contribution to the funds for the non-union employees doing the same work in the laborer classification as union employees.

*D.E.W., Inc. v. Loc. 93, Laborers' Intern. Union of N.A.*, 957 F.2d 196, 202 (5th Cir. 1992).

In its conclusion, the Fifth Circuit held that "D.E.W. has agreed in writing in a signed adoption agreement that it will make contributions for all laborer employees *both union and non-union* as provided in the collective bargaining agreement. Indeed, the adoption agreement *would violate federal labor law if it did not*." *Id.* at 203 (emphasis added).

In this case, Defendants argue that *D.E.W., Inc.* does not apply because it interpreted a union contract under the laws in effect in Texas. (Doc. 38-2 p. 9). The Court is not persuaded.

*D.E.W., Inc.* explained that encouraging union membership would violate Texas state law. However, *D.E.W., Inc.* further explained that an agreement that does not provide for benefit contributions for both union and nonunion employees would violate *federal labor law*. *D.E.W.*, 957 F.2d at 203. *D.E.W., Inc.*, clearly applies in this case because federal law governs rather than

state law. Thus, whether Louisiana is a right to work state is irrelevant to whether Defendant owes contributions for nonunion employees under federal law.

Next, Defendants cite to an out of circuit case, *Kern v. Goebel Fixture Co.*, 765 F.3d 871 (8th Cir. 2014), and argue that in that case the employer did not have to pay contributions because nonunion employees were not represented by the union. Defendants contend that the union does not represent the nonunion employees in our case, thus they should not have to pay contributions. The Funds argue that *Kern* is distinguishable and inapplicable to this case.

In *Kern*, a Trust Agreement[18] stated that "[e]ach Employer shall be responsible only for the contributions payable by him/her on account of Employees covered by him/her." *Id.* at 873. The agreement defined "Employee" as an employee "represented by the Union and working for an Employer ... with respect to whose employment an Employer is required to make contributions into the Trust Fund." *Id.*

The *Kern* agreement covered workers that were employed at a facility in Hutchinson, Minnesota. *Id.* The employer, during negotiations for the CBA, acquired a separate facility in Minnetonka, Minnesota, approximately 50 miles from the Hutchinson facility. *Id.* The union was advised during CBA negotiations that the Minnetonka facility was planned to be a nonunion shop. *Kern*, 765 F.3d at 783. Additionally, the union had never represented workers at the Minnetonka facility. *Id.* Minnetonka employees were subject to different work rules and were paid different wages and benefits than the Hutchinson employees. *Id.* The employer provided health insurance to the Minnetonka employees under a company-sponsored health plan. *Id.* Additionally, the employer never made contributions to the Fund on behalf of its Minnetonka employees, nor had any Minnetonka employee claimed benefits from the Fund. *Id.*

---

[18] The Trust Agreement is similar to the adoption agreement in *D.E.W.*, in that the employer in *Kern* agreed to make contributions in accordance with the terms of the applicable CBA.

The primary issue in *Kern* was the interpretation of the agreement and whether the definition of "employees" in the agreement required contributions to the funds to nonunion workers in the Minnetonka facility. The Eighth Circuit found that it did not because the agreement required a covered employee to be represented by the union. That court also found that there was no mention of the Minnetonka facility in the CBA. That court explained:

> [W]e read the Trust Agreement to unambiguously require that an employee is actually represented by the Union at the time the Fund claims delinquent contributions were owed on behalf of that employee. As it is undisputed that the Union did not "represent" the Minnetonka employees at the times in question, the Trustees failed to demonstrate the Fund was entitled to the contributions they seek under the terms of the Trust Agreement.

*Kern*, 765 F.3d at 876.

Contrary to Defendants' assertions, *Kern* is inapplicable to this case. Not only is *Kern* not binding upon this court, even if it were, the terms of the CBA in this case contain no provision or definition related to union membership or union representation. Furthermore, the work jurisdiction of the CBA in this case covers work performed in Louisiana, rather than in one facility. Thus, the Court agrees with The Funds that *Kern* is inapplicable to this case.

As stated above, the Parties have agreed that a majority of roofing work done by Defendants is described under Article III Section 3 of the CBA. (Doc. 33-2, p. 3); (Doc. 38-1, p. 4). Also, they have agreed that Defendants perform roofing work described in Sections 2 and 4 of the CBA. (Doc. 33-2, p. 3). Thus, because Defendants admit that their employees perform roofing work described in Sections 2, 3 and 4 of Article III of the CBA, contributions are owed for those employees who performed such work. This applies to employees who are union and nonunion because, as was the case in *D.E.W., Inc.*, the CBA would violate federal law if it did not apply to nonunion employees.

Accordingly, The Funds' Motion for Summary Judgment is granted in this respect: fringe benefit contributions are owed as a matter of law for union and nonunion employees under the CBA.

## 2. Written Authorization Requirement of the CBA

Next, Defendants argue that written authorization from each employee is required under the CBA in order for The Funds to be entitled to contribution payments. (Doc. 38-2, pp. 4; 6-10). Defendants argue that because no employee has given written authorization for contributions, The Funds are not entitled to contributions. *Id.*

Defendants cite to Article V in support of their argument:

**Article V**
**Union Security**

Section 1. No Employee shall be required to become or remain a member of the Union as a condition of employment.

Section 2. When authorized by the individual employee in writing, the Contractor will deduct from the pay from such employee, initiation fees where applicable the monthly dues of the Union in the amount of 4% of said employee's weekly gross wages, Per Capita Tax and Burial Benefits of twenty dollars per month plus eleven cents ($.11) per hour International Working Dues and remit said funds to the Local Union on a monthly basis.

(Doc. 33-6, p. 6).

The Funds counter that Defendants' "obligation regarding benefit contributions [is] described in Articles XXIV and XXV, Section G." (Doc. 39, p. 3). Section G provides, in pertinent part, that "contributions ... shall accrue with respect to all hours worked by any working foreman, journeyman, apprentice or for any person performing work within the collective bargaining agreement unit covered by this Agreement … " (Doc. 33-6, pp. 19; 21). The Funds contend that "[Defendants'] interpretation that contributions require employees to join the Union

or sign off on union deductions misses the mark because covered employment comprises all employees engaged in roofing and waterproofing." (Doc. 39, p. 3). Finally, The Funds assert that Defendants have confused deductions for Union dues with benefit contributions.[19] (Doc. 39, p. 3, n. 5).

Here, the Court agrees with The Funds. Article V of the CBA is not related to Defendants' obligation regarding benefit contributions. Rather, Article V concerns written authorization for the deduction of Union dues. There is no similar provision in the CBA that requires written authorization for benefit contributions. Furthermore, Section G clearly explains that Defendants' obligation to pay benefit contributions accrues with respect to all hours worked by employees covered by the CBA and any person performing work covered by the CBA. Thus, the Court rejects this argument by Defendants.

### 3. Unjust Enrichment

Next, Defendants argue that The Funds are attempting to unjustly enrich themselves by arguing that only Union members will receive the benefits of nonunion contributions. (Doc. 38-2, p. 4). Defendants argue that "[u]nder the theory of [The Funds] the less union workers that are registered with the union or are union members, the more the union members benefit because the pie is built each month by nonunion workers, who will never participate in the Union's benefits." (Doc. 38-2, p. 4).

---

[19] The Funds cite to Article XXVI, which provides:

**Article XXVI**
**Contributions Rules to the Trust Funds**
**\*\*\***

Payment of all contributions referred to in this Article are to be deductible by the employer in calculating federal and state income taxes or payroll taxes and are not to be considered wages for the purposes of determining federal social security taxes. Said contributions are not taxable to employees in determining their income or social security tax payments. Said contributions are not to be construed as a portion of the payroll in calculating insurance premiums to be paid by employers.

(Doc 33-6, p. 21).

Here, the Court is not persuaded by this argument. First, Defendants cite to no case law to support the proposition that, by virtue of this contractual arrangement, The Funds are unjustly enriching themselves by receiving contributions. Second, the nonunion employees are not required to participate in the Union, nor pay any dues to the Union unless they provide written authorization. Finally, as explained above, Defendants confuse their obligation to pay benefit contributions to The Funds' with the Union's benefits. Accordingly, the Court rejects this argument by Defendants.

In sum, as explained above, as a matter of law Defendants owe contributions for nonunion employees who performed covered work under the CBA. Thus, the Court grants The Funds Motion for Summary Judgment with respect to this issue.

## D. Presumption of Correctness for The Funds Audit Report

As explained above, the Court has found Defendants owe contributions for nonunion members who perform covered work under the CBA as a matter of law. Thus, the Court must now determine whether The Funds are correct about the amount owed. As The Funds have argued that their payroll audit is "entitled to a presumption of correctness," (Doc. 33-1, p. 21), the Court addresses this argument before discussing the arguments by the parties concerning individual employees.

### 1. Parties' Arguments

The Funds' auditor included all "general laborers" in its calculation to determine what contributions were owed. (Doc 33-7, p. 2). The Funds assert in their reply memorandum that the auditor included all "general laborers" in the audit report because of "Mouk's explanation that when a formerly classified roofer from the union returned to [Defendants], '[h]e came back to the company as a general laborer.' " (Doc. 39, p. 8); (Doc 33-7, p. 2). Furthermore, The Funds'

auditor included in his calculations unpaid contributions to the sheet metal workers' Funds. (Doc 33-1, p. 21). The sheet metal workers' Funds are not a party to this suit.

The Funds cite to numerous portions of Mouk's deposition testimony that shows individual employees performed "some roofing," weren't "involved in much roofing," and worked in roofing, "just not all the time." (Doc. 33-1, p. 17-18) (citing Doc. 33-4). The Funds essentially use these statements to argue that employees classified by Defendants as "general laborers" performed work covered by the CBA. The Funds assert that contributions are owed for these employees.

The Funds argue that their audit report is entitled to a presumption of correctness and cite to a number of out of circuit cases. (Doc. 33-1, p. 21). The Funds contend that "[t]his presumption provides relief for Plaintiff Funds to provide 'precisely how much of the work performed by the defendant's employees was covered work when the employer has failed to keep records that would have allowed the fund [to] accurately calculate such damages.' " (Doc. 33-1, p. 21) (quoting *Laborers' Pension Fund v. A & C Envtl., Inc.*, 301 F.3d 768 (7th Cir. 2002)). The Funds argue that case law "provides a shift in the burden when the employer breached its duty to keep records from which a determination may be made". *Id.* The Funds argue that "courts have awarded … Plaintiff Funds contributions for all hours worked unless the employer can raise a genuine issue of material fact as to the accuracy" of the calculations made by Plaintiff Funds. (Doc. 33-1, pp. 21-22).

Defendants "vehemently object[] that the Funds Auditor 'provided a sound payroll audit' because the assumptions used by the Funds' Auditor on the classification, job duties and time spent along with assumed amounts due from nonunion workers were incorrect and gave incorrect results." (Doc. 38-2, p. 5). Defendants argue that general laborers "do not do roofing work

exclusively and some of them do no roofing at all and are drivers, clean up personnel, metal building fabricators and other workers required to conduct [Defendants'] numerous business endeavors." (Doc. 38-2, p. 2-3). Defendants attach an affidavit from Mouk that asserts that certain employees performed "no roofing work," or were "general laborers only." (Doc 38-3, pp. 4). Furthermore, Mouk's deposition testimony and affidavit assert that their classification of employees as "roofers" was for insurance purposes. (Doc. 33-4); (Doc. 33-8).

The Funds counter that "[c]ourts infer questions of accuracy and coverage against the employer when the employer fails to adequately identify job duties of their employees." (Doc. 39, p. 7). The funds assert that Defendants lack "evidence as it pertains to individual employee hours in covered employment." (Doc. 39, p. 7). The Funds assert that "[Defendants] only give[] broad assertion[s] that general laborers 'do not do roofing work exclusively ...' " (Doc. 39, p. 7) (emphasis omitted). The Funds argue that "Mouk confirmed that a majority of the general laborers from the audit did 'some' roofing work." (Doc 39, p. 8). Finally, The Funds contend that "[t]he Fifth Circuit has … found where inaccuracies in the audit are due to the employers inadequate records, the Funds' audit should be accepted." (Doc. 39, p. 7) (citing *Bugher v. Consol. X-Ray Serv. Corp.*, 515 F.Supp. 1180, 1184-1185 (N.D. Tex. 1981) aff'd, 705 F.2d 1426 (5th Cir. 1983)).

### 2. The Fifth Circuit's Acceptance of Audit Reports

First, the Court rejects The Funds' assertion that the Fifth Circuit has found that Plaintiff Funds' audit reports should be accepted. While The Funds cite to *Bugher*, 515 F.Supp. 1180, in support of their argument, The Funds' assertions are inconsistent with the holding of *Bugher*.

The district court in *Bugher* addressed a different factual situation than the one before the Court. In *Bugher*, the defendant was in the business of conducting nondestructive testing in

laboratories and in the field. *Bugher*, 515 F. Supp. at 1181. The defendant and union in *Bugher* entered into a CBA that covered employees engaged in nondestructive testing in the field. *Id.* A dispute arose over what contributions were owed. *Id.*

The plaintiff funds in that case provided the court with an audit, and the defendant provided "what amounts to a rebuttal audit." *Bugher*, 515 F. Supp. at 1184. However, the defendant's president refused to turn over weekly time reports to the plaintiffs, which made it impossible for the plaintiff's auditor to discern the duties of individual employees and the work performed on various jobs. *Id.* Further, the defendant's rebuttal audit assumed that only union members were covered and also that only work performed on certain jobs in the field were covered. *Id.*

The district court rejected the defendant's argument that the definition of "field" as it related to field work was not modified by a parole agreement. *Id.* The district court explained "the Court does not find the facts to be as alleged by Defendant.... it appears that Defendant and Plaintiff Union were in a cat and mouse game. Plaintiff Union tried to enforce the written contract as best it could in the face of Defendant but was not always successful." *Id.*

The district court found that the contract was clear as to what work was covered and rejected defendant's arguments for two reasons. The trial court explained:

> The differences between Plaintiffs' audit and Defendant's rebuttal audit may be attributable to two things. First, Defendant's refusal to remit contributions and dues on the on the above basis [that employees were only covered if they were union members and working on specific jobs]. Second, any inaccuracies in Plaintiffs' audit that were caused by Defendant's unwillingness to turn over its records to the auditor. So the Court finds that it accepts the assumptions underlying Plaintiffs' audit and rejects Defendant's counter-audit.

*Id.* at 1185 (paragraph break omitted).

On appeal, the Fifth Circuit did not directly address the issue of accepting the plaintiff's audit over the defendant's. The Fifth Circuit addressed the audit report only to determine whether attorneys' fees were proper. *Bugher v. Consol. X-Ray Serv. Corp.*, 705 F.2d 1426, 1436-37 (5th Cir. 1983). The Fifth Circuit did not hold that a plaintiff funds audit report should be accepted.

In this case, the parties agree that Defendants provided complete payroll records as they pertain to all employees. (Doc 33-2, p. 4); (Doc. 38-1, p. 5). There is no allegation that Defendants have refused to turn over vital records.[20] Furthermore, Defendants have not produced their own "counter-audit." While this certainly weighs against the Defendant, this in and of itself does not mean that the Court is required to accept The Funds' audit report. In sum, there is no binding decision upon the Court that requires the Court to presume The Funds' audit report is correct.

### 3. The Funds' Audit Report Is Inherently Flawed

Next, the Court finds that it is unnecessary to determine whether to apply the out-of-circuit burden shifting rule that The Funds assert applies to this case because The Funds' audit report is inherently flawed.[21] This flaw creates a genuine issue of material fact as to the amount of contributions Defendants owe The Funds.

---

[20] While The Funds make multiple assertions that Defendants had been ordered by this court to produce certain records (Doc. 19), that ruling has no bearing on the Court's analysis because the parties have agreed that complete payroll records were provided for the audit report.

[21] While the Court declines to apply what other circuit courts have called the "*Combs* burden shifting rule," *see Combs v. King*, 764 F.2d 818, 826 (11th Cir. 1985), the Court notes that the circuits are split as to how to apply this rule, especially at the summary judgment stage. *Compare Mot. Picture Indus. Pension & Health Plans v. N.T. Audio Visual Supply, Inc.*, 259 F.3d 1063, 1067 (9th Cir. 2001) (holding that plaintiff funds cannot "prove the fact of damage" by relying solely on the presumptions and calculations of auditors reports); *Illinois Conf. of Teamsters and Emp'rs Welfare Fund v. Steve Gilbert Trucking*, 71 F.3d 1361, 1367 (7th Cir. 1995) (holding that an employer's affidavit and deposition testimony contesting the amount of hours that were "covered hours" can raise a genuine issue of material fact to preclude summary judgment against an employer as to the amount of damages); *PACE Indus. Union-Mgt. Pension Fund v. Dannex Mfg. Co., Inc.*, 394 F. App'x. 188, 197 (6th Cir. 2010) (unpublished) (providing examples of how an employer may rebut an audit report's calculation by producing records, providing expert testimony criticizing the audit's methodology, or offering an alternative calculation); *Morin v. Spectrum*

### a. Sheet Metal Workers

The Funds' audit report is inherently flawed because no provision of the CBA allows for them to receive contributions owed to *another* benefit fund for work not covered by the CBA.

The Funds argue that Defendants operate under a second collective bargaining agreement with the sheet metal workers. (Doc. 33-1, p. 19). However, The Funds do not provide this second collective bargaining agreement to the Court. The Funds assert that Evans "opined that no contributions are owed on the nonunion [sheet metal] employees." *Id.* (citing Deposition Testimony of John Evans, Doc. 33-5, p. 28). The Funds argue that the payroll auditor found sheet metal workers had unaccounted for contributions. *Id.* at 20.

The Funds cite to a portion of two Articles of the CBA and argue that Defendants owe them contributions for sheet metal workers because the CBA requires "where another fringe benefit fund of a similar kind exists and the Employer is contractually obligated to, and does, contribute to that fund, then the said Employer shall not be required to pay contributions to this fund." *Id.* (citing Article XXV Health and Welfare, and XXVI Pension Plan, Section G of the CBA,[22] Doc. 33-6, pp. 19-21). The Funds argue that this provision requires Defendants to pay the alleged delinquent sheet metal worker contributions to them. The Funds' argument is essentially that they want the unpaid contributions that are allegedly owed to *another* benefit fund.

---

*Contracting Group, Inc.*, CV 08-3567 SJF AKT, 2011 WL 1323005 (E.D.N.Y. Jan. 13, 2011) *report and recommendation adopted*, 08-CV-3567 SJF AKT, 2011 WL 1253232 (E.D.N.Y. Mar. 28, 2011) (explaining that the Second Circuit has favorably cited the burden shifting analysis, but has not adopted it, and that a majority Second Circuit district courts reject the burden shifting analysis at the summary judgment stage.).

[22] Section G is identical in both Articles. However, one concerns the Welfare Fund and that other concerns the Pension Fund.

The Court rejects this argument. While The Funds cite to parts of Section G of Articles XXV and XXVI, the section as a whole shows that they are not entitled to sheet metal worker funds. Section G, in its entirety, provides:

> The contributions required by this Article shall accrue with respect to all hours worked by any working foreman journeymen apprenticeship or for any person *performing work within the collective bargaining agreement unit covered by this Agreement* and said contributions shall accrue with respect to all hours worked by *employees covered by the terms of this Agreement* within or outside the geographical jurisdiction of the Union, EXCEPT when work is performed outside of the Union's geographical jurisdiction where another fringe benefit fund of a similar kind exist and the Employer is contractually obligated to, and does, contribute to that fund then, the said Employer shall not be required to pay contributions to this Fund under this Article.

(Doc. 33-6, pp. 19; 21) (emphasis added).

Contrary to The Funds' assertions, this section does not entitle them to contributions that are allegedly owed to other funds for sheet metal workers. This article requires Defendants to pay contributions to The Funds for *covered* work performed within or outside of the geographical jurisdiction of the Union. This CBA does not contemplate any work performed by sheet metal workers. While the CBA defines roofing work at great length, no definitions of sheet metal work are contained within the agreement.

The Fund's essentially seek payments for sheet metal workers, but have failed to establish that the sheet metal workers performed any work covered by the CBA. Furthermore, The Funds would not be entitled to contributions for sheet metal workers who do not perform covered work under the CBA because The CBA provides:

**Article XXVI**
**Contribution Rules to the Trust Funds**
\*\*\*

> The Parties hereby agree that notwithstanding the provisions of Articles XIV, XXV and XXVI, no contributions to any of the

> funds shall be due and owing for or on behalf of any employee otherwise covered by the terms of this agreement who performs work outside the scope of this Agreement, where the employee is engaged in make work, where the employee is engaged in clean up work around the shop and yard, or *any other work not specifically covered by the terms of this Agreement*.

(Doc. 33-6, p. 22) (emphasis added).

This provision clearly establishes that no contributions are owed for work not specifically covered by the CBA. Thus, The Funds are not entitled to receive contributions for the sheet metal workers because The Funds have not produced the second CBA and The Funds have not established that sheet metal workers performed work covered by the CBA.

Additionally, The Funds' audit report from Legacy explains that they "included all hours worked by the General Laborers and Non-Union Sheet Metal employees." (Doc. 33-7, p. 3; 13). Legacy explains that certain procedures were applied to the audit report, such as limiting the audit only to records provided to them. However, Legacy does little to explain the methodology used to perform the audit. Further, what is apparent is that Legacy calculated the total delinquent contributions[23] for both general laborers and nonunion sheet metal employees between the months of January 2011 and December 2013. (Doc. 33-7, pp. 6-10; 17-24). Nonunion sheet metal employees were also included in the interest calculations, as well as the liquidated damages calculations. *Id.*

As explained above, The Funds are not entitled to contributions from Defendants for sheet metal workers. Thus, because all hours worked for sheet metal workers were included in each step of the audit report when determining the total amount of delinquent contributions, liquidated damages, and interest owed by Defendants, The Funds' audit report is inherently

---

[23] While the audit report labels the monthly amounts as monthly "discrepancies," it is clear that the audit report is referring to monthly delinquent contributions.

flawed. The Funds are responsible, as movers, to show there is no genuine issue of material fact. *See* Fed.R.Civ.P. 56(a).

They have not done this. For this reason, The Funds' Motion for Summary Judgment is denied as to the amount of contributions that Defendants owe to The Funds.

**b. Contributions Owed for General Laborers**

While the Court has found that The Funds' audit report is inherently flawed, the Court also finds that Mouk's deposition testimony creates a genuine issue of material fact to preclude summary judgment as to the amount of damages for individual employees based solely on their classification.

The Funds argue that contributions are owed for employees classified as "general laborers" because they perform roofing work. (Doc. 33-1, pp. 16-19). The Funds also argue that the employees classified as "general laborers" under Defendants' Employee Classification Report (Doc 33-9) are on Defendants' payroll as "roofers" according to Defendants' Payroll Allocation Record (Doc 33-8). *Id.* Further, The Funds argue that Defendants cannot rebut their audit reports presumption of correctness because they "lack evidence as it pertains to individual employee hours in covered employment". (Doc. 39, p. 7).

Defendants argue that general laborers do not exclusively perform roofing work. (Doc. 38-2, p. 2). Defendants contend that "some of them do no roofing at all and are drivers, clean up personnel, metal building fabricators and other workers required to conduct [D]efendants numerous business endeavors." (Doc. 38-2, p. 2-3).

Furthermore, Mouk testified in her deposition that a number of general laborers at issue were (1) not involved in much roofing, (2) involved in some roofing, (3) may have gone out at some point to do roofing work, and (4) have been involved in some roofing projects. (Doc. 33-4,

pp. 64-69). Mouk testified that "[i]n insurance, there's either sheet metal or there's roofing. Anyone who is not a sheet metal worker under insurance is classified under a roofing insurance wage." (Doc. 33-4, p. 60).

The Court rejects The Funds arguments and finds that summary judgment is inappropriate on this issue. First, the Court declines to address The Funds argument that Defendants lack evidence to rebut their audit reports presumption of correctness because, as explained above, The Funds audit report is flawed. [24]

Second, the Court finds that Mouk's testimony that employees classified as "roofers" on their payroll for insurance purposes creates a genuine issue of material fact. Classifying employees as a "general laborers" but labeling them as "roofers" on the payroll, tends to show that those employees performed roofing work. However, Mouk's testimony explains that the discrepancies between the Employee Classification Report and Payroll Allocation Record are for insurance purposes.

Third, Mouk's testimony explains that a number of employees perform "some" roofing work. While this clearly shows that certain employees performed covered work under the CBA, it does not establish how much covered work was performed.

Thus, summary judgment is inappropriate because (1) there is a genuine issue of material fact as to whether Defendants classify employees as roofers for insurance purposes, and (2) there is a genuine issue of material fact as to the amount of covered work employees performed. Therefore, The Funds' Motion for Summary Judgment is denied with respect to contributions owed for employees classified as "general laborers."

---

[24] While other circuits have found that an employer has a duty under ERISA to maintain adequate records in accordance with 29 U.S.C. § 1059 in order for benefit funds to correctly calculate benefits, (*see*, collected cases in note 21 *supra*), the Fifth Circuit has never addressed this issue. Further, as The Funds' audit report is flawed, the Court declines to address this issue at this time.

### c. Contributions for "Overlooked" Workers.

Both Parties agree that Eugene Jackson and Roosevelt Givens should be classified as roofers. (Doc 33-2, p. 4); (Doc. 38-1, p. 6). The Funds assert that Jackson and Givens were "overlooked" by Defendants, and cites to Mouk's deposition where she admits they were "possibly overlooked." (Doc. 33-1, p. 16) (citing Doc. 33-4, p. 56). The Funds assert that "Mouk believed that the Union classified Jackson as an apprentice and Givens as a journeyman." (Doc. 33-1, p. 16) (citing Doc. 33-4, p. 59).

Defendants contend that "the sums owed at the beginning of the lawsuit were of inconsequential value and when the accounting errors were discovered by [Mouk] the sums due were immediately remitted to the [The Funds]." (Doc. 38-2, p. 6). However, Defendants provide no evidence to show that any payments were made.

Even so, The Funds admit in their Memorandum in Support that "[i]n the course of this litigation, [Defendants] paid contributions on behalf of Eugene Jackson in the amount of $9,201.05. These amounts have been applied as a credit towards delinquent contributions owed." (Doc. 33-1, p. 15 n. 71). However, as to delinquent contributions beyond Defendants' admitted payment, little evidence is provided as to whether these overlooked workers performed covered work. The Funds merely rely on the employees' classification in their argument. (Doc. 33-1, p. 15).

Drawing all inferences in favor of Defendants, Mouk's belief that Jackson and Givens were classified as apprentice and journeyman respectively by the Union is not enough for The Funds to establish that there is no genuine issue of material fact as to whether Jackson and Givens are owed contributions under the CBA. The Funds have provided no evidence that Jackson and Givens were actually classified by the Union. Further, even though the parties agree

that Jackson and Givens should be classified as "roofers," Mouk testified that these classifications are for insurance purposes. Thus, there exists a genuine issue of material fact as to the amount of contributions are owed for Jackson and Givens. Therefore, The Funds Motion for Summary Judgement is denied with respect to the amount of contributions owed by Defendants for Jackson and Givens.

### E. Continuing Contributions

The Funds seek continuing contributions from January 2014 to present. As explained above, Defendants admit in their Motion in Opposition that the CBA was automatically renewed through 2015. (Doc. 38-2, p. 8). The CBA provides that: "This agreement shall continue in force and effect from year to year after November 30, 2014 unless [Defendants] or the Union shall notify the other in writing at least sixty (60) days prior to the expiration of the terms of this ... Agreement." (Doc. 33-6, p. 25). This provision extends the CBA for one year unless either Defendants or the Union terminate it. Thus, because Defendants admit the CBA was renewed, the CBA continues in effect until at least November 30, 2015.

As explained above, Defendants owe contributions for nonunion employees that perform work covered by the CBA. These contributions continue to be owed, as a matter of law, until the CBA is terminated. Therefore, The Funds' Motion for Summary Judgment is granted in this respect because Defendants owe contributions that have accrued from January 2014 to present. However, the amount of contributions owed remains to be determined.

### F. Accruing Interest and Liquidated Damages

The Funds seek accruing interest at a rate of 12 percent per annum and liquidated damages of 10 percent on all contributions. As explained above, Defendants admit that the CBA was automatically renewed. Section E of Articles XXII and XXV of the CBA provide that:

> All contributions to [The Funds] shall be due on or before the tenth
> (10th) day of the month following the month of employment in
> which contributions are earned and shall become assets of [The
> Funds] on such date regardless of remittance. In the event such
> contributions are not received by the due date, liquidated damages
> in sum of ten percent (10%) of the *unpaid contributions* owing or
> unpaid by the due date shall automatically be due and payable
> *together with the interest* computed at the rate of twelve percent
> per annum, and together with all costs incurred by [The Funds].

(Doc. 33-6, pp. 18; 20) (emphasis added).

Thus, as a matter of law, interest and liquidated damages continue to accrue until paid.

Therefore, The Funds Motion for Summary Judgment is granted in this respect. While interest

and liquidated damages continue to accrue on delinquent contributions as a matter of law, the

Court notes that the amount of delinquent contributions owed by Defendants has not been

determined, for the reasons set forth *supra* Part IV(D)(3).

## V.     Conclusion

Accordingly,

**IT IS ORDERED** that Plaintiffs' Motion for Summary Judgment is hereby **GRANTED**

**IN PART** and **DENIED IN PART**;

Plaintiffs' motion is **GRANTED** in that, as a matter of law, contributions are owed by

Defendants for nonunion employees who performed work covered by the CBA;

Plaintiffs' motion is **GRANTED** in that, as a matter of law, Defendants owe

contributions for union and nonunion employees that accrue from January 2014 until the CBA is

terminated;

Plaintiffs' motion is **GRANTED** in that, as a matter of law, Defendants owe accruing

interest at 12 percent per annum and liquidated damages of 10 percent on all delinquent

contributions until paid; and

In all other respects Plaintiffs' Motion for Summary Judgment is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' are given 14 days to supplement their Statement of Uncontested Facts to assert that they are in fact governed by ERISA. Defendants are given 7 days to respond in order to dispute this fact, if they can do so in good faith.

Signed in Baton Rouge, Louisiana, on <u>June 29, 2015</u>.


_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**